May it please the court, Leif Overvald from the Department of Justice on behalf of the defendants. I would like to reserve three minutes for rebuttal. No problem at all. I'd like to start by clarifying the allegations underlying the Bivens complaint. In this case, briefly, this is not a case in which any prison official is alleged to have denied the plaintiff any treatment or medication that the doctor prescribed, either in the Loretto facility or anywhere else. Was he under treatment by a psychiatrist? He was under treatment by a psychiatrist. As reflected in the complaint, he was receiving medication for the mental health disorders that he alleged he was suffering from. And, in fact, the complaint reflects that in response to some of the concerns he expressed about eating at the prison dining hall, some of his medications were increased. So the government's not taking the position that a psychiatric condition isn't a medical condition, is it? We're not. No, we are. Okay. So if you make allowances for medical needs with meals, and it seems unrebutted that you do, if there's a real and a diagnosed and a being treated psychiatric condition, why not treat that as you do other medical conditions and make the accommodation that the person is seeking? What's the rationale? Well, the government's not taking the position that there's no, there cannot be a circumstance in which a psychologist might recommend or a psychiatrist might recommend some accommodation. I'm not aware of a circumstance in which a change not in sort of the diet that a particular inmate is being provided, but the manner in which the Bureau of Prisons has to provide the meals, that's been recommended as sort of an aspect of psychiatric treatment. From the Bivens' perspective, the fact that the thrust of the complaint here is not a failure to treat any mental health disorder that he's suffering from, it's clear that he is receiving treatment for those disorders. It's that some accommodation is allowed, is required to allow him to receive adequate nutrition. Wouldn't that have to be, the fact that his psychiatric condition was interfering with his ability to get sufficient nutrition, doesn't that, since he has been being treated psychiatrically, medically for that condition, doesn't there have to be some medical verification or attestation that eating alone is necessary before the prison officials have to pay any attention to what he's saying? Certainly, we think it's relevant both for the Abbasi analysis and the qualified immunity analysis that he hasn't alleged that anyone ever prescribed that this accommodation was required either at this facility or anywhere else. It seems to me if he has a claim it's for medical malpractice, but he's made no claim that he's not being appropriately taken care of by a psychiatrist. We would agree that, I mean, to the extent there's any allegation, it's sort of a dissatisfaction with the treatment which he's providing, and that's sort of inadequate health care in the connection with sort of non-psychiatric and psychiatric disorders. That doesn't give rise to either an Eighth Amendment claim. Well, he's got a – the picture painted in the complaint is in effect that he goes to the medical staff, his psychologist, and he says, I can't do this. I can't eat in this setting. I get panic attacks. I can't do it. And they say, you've got to talk to the food service people. It's not our place. We can't do it. So he goes to the food service people, and they say, yeah, it's not our issue. It's a medical issue. I mean, has the Bureau of Prisons set up a catch-22 for somebody in Mr. Simpson's position where, you know, everybody's pointing the finger at somebody else, and he's in the middle and unable to eat? Well, the allegations don't reflect that there's sort of like both sides pointing at each other. I mean, he attached the responses he received as administrative remedy requests to the complaint, which reflect on the food service side that he's being told we've consulted with doctors and the psychological staff, and they've determined this accommodation is not necessary, which, again, we're not. So is it just that he's saying that when he says in his complaint that they said we can't help you, it's the food service people, that the psychology staff is just like soft-pedaling their real position, which was you don't need this? They just didn't want to tell him to his face, so they had it go through food service? Well, he alleged that one defendant, Dr. Rabinovitz, told him that made the statement that you have to request accommodations through food service. There's no allegation in the complaint. Did he go to the commissary folks and see what could be done? It's a little unclear the chronology of who he talked to first. Certainly the allegations reflect that he requested the accommodation from the food service personnel, and then they denied the request. We have the administrative remedy denying the request that reflects consultation with medical and psychiatric staff and a determination it was not necessary. But the point, I mean, from the perspective, I guess, from the qualified immunity perspective, for the medical officials, the point is that the allegations reflect he raised a concern. He wasn't met with no treatment. In fact, there was an increase in the dosage of certain medications he was receiving as a result. That does not give rise to an Eighth Amendment violation. Even the cases that the plaintiff has cited, the Kakinda decision, for example, involving a medical diet, recommending sort of a conservative approach, that does not constitute an Eighth Amendment violation. For the non-medical officials there, I mean, it's clear he is getting he's being treated by prison psychiatric staff. They're not recommending an accommodation, not sort of granting a change in the food service policy. In those circumstances, this Court has indicated that that does not constitute deliberate indifference under the Eighth Amendment. What they were suggesting is that some type of medication can have a real accommodation in terms of how the process of eating takes place in connection with the general population. Is that correct? That was certainly the treatment that was offered. And there's no allegations that he sort of went back to anyone to say. Are there any remedies the state court law might provide for Simpson's claim? He, I mean, so, and this gets to the Abbasi analysis to some degree. I mean, there are a number of avenues for pursuing the accommodation he's seeking. The principal ones perhaps might be the administrative remedy program, the Bureau of Prisons. There's also the regulations under the Rehabilitation Act that provide sort of procedures, particularly for requesting an accommodation alleged to be required as a result of a disability. That's a set of, another set of administrative procedures. It's possible under the FTCA. He went through the administrative procedures, right? He did. He did pursue this through the administrative remedy. It's not clear from the complaint release that he also pursued it through the Rehabilitation Act procedures. But the fact that he had the avenue for pursuing the accommodation, which I think is clearly the thrust of his complaint, it's not a complaint grounded in failure to treat. It's a denial of this requested accommodation. He had that avenue for pursuing it. So when you're looking at the qualified immunity piece of this, where did the district court go awry? What's your argument for why the district court couldn't say, look, and I recognize that assumes we're getting past your motion to dismiss. What's the, where's the error in the district court's analysis? Well, just the fact, I mean, in our view at least, they're both independent grounds that the court. But you don't get the qualified immunity if you go on the first issue. That's true. That's true. So assume you got, assume you went on the first issue because we wouldn't talk about qualified immunity. The dismissal was right. Assume you got past that because it was determined, you know, that you didn't deserve a motion to dismiss. And we were looking at qualified immunity. Why was the district court wrong in saying there's a problem here? There's enough facts alleged to make me think that there's a denial of rights under the Eighth Amendment. What's wrong with it? The district court erred in defining the constitutional right at too high a level of generality and giving insufficient attention to the particular allegations against each individual defendant. Because I think if you look at what's actually alleged against each of the defendants, there's nothing that plausibly indicates a violation of a clearly established right to the accommodation being requested under the circumstances alleged. Why don't we hear from Mr. Mouse and we'll get you back on rebuttal then. Thank you, Your Honor. Welcome back. Welcome to Simon Delaware. Thank you. You can take your mask off if you like. Yes. Thanks. May it please the Court, I'm Robert Niles-Weed for Appalee. Jesse Simpson. Do you argue that Simpson's claim is materially identical to Carlson because the complaint alleges that prison officials acted with deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights? But didn't he allege that also the prison officials attempted to treat his mental disorders on several occasions? So he does allege that there was some treatment provided initially, but what's important are the allegations he provides after that, which is that after the initial severe panic attacks, he went back to medical staff multiple times, and as Judge Jordan was suggesting, they pointed him to go to food service. And food service, when he went to them on multiple occasions, pointed him back to the medical folks. And he was in a situation where they had already increased the medication, and he says in the complaint, this is 83 of the appendix, that it was more than a medication issue. And then at 33 of the complaint, 70 of the appendix, he talks about how he went back to the medical staff on multiple occasions. What would you say would be the serious medical need? So I actually think it's the conjunction of two serious medical needs. The first is his diagnosed social anxiety disorder and Asperger's syndrome that was causing him, when he went into the dining hall, such severe anxiety that he could not cope with the mental distress. But then there's a second need, which is in the subsequent approximately three months, when he was denied the ability to eat in the dining hall, he was suffering the health effects. He wasn't denied the ability to eat in the dining hall. He was told he had to eat in the dining hall, and he didn't want to do it, right? Isn't that the problem? That's not exactly how I would characterize the problem, and it's not how he characterizes it in the complaint. It's not the case that he didn't want to eat in the dining hall. He said he couldn't. So here's the question. If he's being treated, he's getting medication, he goes back and he says, it's not a medication problem, I want this other thing. And they say, look, we've done what we can for you. Why isn't that just simply a case of a prisoner saying, I want it to be treated in addition or with something else, and they wouldn't do it? And that's a disagreement with medical providers. It happens all the time in prisons. And we don't typically let the prisoners decide what their medical treatment is going to be or give them rights when they say they don't like what the medical treatment prescribed was. Why is this any different from that situation? So the reason it's different is because the question for the purpose of the Eighth Amendment and Qualified Immunity Analysis is whether the officers were deliberately indifferent to the risk of serious harm. And here they gave him medication, and when he said, it's not working for me, they upped his dosage. And when he said, I still want something else, they, in effect, said no. Why isn't that just like a straight up, I want something more, and the medical professionals say no? And their medical opinion. I mean, he wasn't denied medical care. So he went back to the medical professionals multiple times, letting him know that he was suffering the inability to eat, which is a serious harm recognized under the Eighth Amendment. He was not getting the nutrition he needed. He alleged he was suffering from malnutrition, and they refused to provide any care. In fact, he alleges they refused to even see him. And so at the point at which, even if there was some medical care provided at an earlier date, if he is still suffering the risk of serious harm, and the officers being informed repeatedly of that harm fail to do anything about it. So is it the case, then, Mr. Nilesweed, that if somebody is told, look, we're the medical professionals, and we just don't think you need this, that if the prisoner keeps saying the same thing over and over again and doesn't get a different answer, that that creates deliberate indifference? I think that ultimately will be a question that gets resolved at a later stage of the case in discovery about the precise nature of the harm he was suffering. I think if it's the case that he was continuing to suffer a harm that's cognizable under the Eighth Amendment, which here he alleges he was suffering from malnutrition and the lack of adequate nutrition, and he's actually suffering that harm, and the medical professionals nonetheless refuse to do anything about it. And as to the prison officials, he alleges that it was based on bad faith or spite and malice. And if the reason they're refusing to treat his severe harm is because they're deliberately indifferent to it, I do think there is an Eighth Amendment violation. Now, it might be the case at a later stage that the— Well, let's stop and just ask as a practical matter. If we were to agree with what you're saying, what would prevent any prisoner from saying, I just can't do it, I just can't eat with these people? It really, really upsets me. You have to make—you've got to let me—you've got to bring my food to me in my cell. That's what I need. Are we going to get in the position where everybody gets, in effect, room service, cell service, because that's what they assert they have to have? And medical professionals, if they say, I don't think you need it, it doesn't matter, because the prisoner says, that's what I need. Absolutely not, Your Honor. That's not— How are we not there with this assertion? So I understood the government to accept that there's no relevant distinction between medical illnesses and psychiatric disorders, in the sense that a diagnosed psychiatric disorder can cause the type of severe harm that's cognizable under the Eighth Amendment that would give rise to such a claim. And here Simpson alleges that that was exactly what he was suffering from, in the sense that— There's no expert or no medical treating doctor who is saying that he needs to eat alone. Don't you have to—if basically your claim is based on the need for further medical treatment of his anxiety being in crowds, and doesn't he need to bring that, if it is a valid claim, doesn't he need to bring that against the medical staff who are treating him, with verification by a medical expert who's saying that, yes, absolutely, this guy needs this treatment, and it's a violation of appropriate medical treatment not to provide him with it. I don't think that's required, Your Honor, on a pro se motion to dismiss stage. What he does allege is that prior to arriving at Loretto, a psychiatrist, a medical doctor, had diagnosed him, and there was an extensive history of medical professionals documenting his mental illness. And he alleges that when he tried to eat in the dining hall, he could not cope with the severe mental distress it caused. There might ultimately be testimony from medical experts and these doctors and treating professionals at the summary judgment stage. That's exactly what discovery is for. But here at the motion to dismiss stage, he's alleged that he had exactly the type of disorder you're describing, which is a psychiatric disorder diagnosed by medical professionals that caused him severe harm when he tried to eat in the dining hall. But that's not verified by any medical professional. I don't know. I used to defend medical malpractice cases, so I'm used to litigants coming into court who have established from a doctor that they need this treatment. And how can you say he needs this treatment if no doctor will verify that? At this stage, all we have is his allegations. He shouldn't be in court until you get a little further along in the case, if you can do so. But our question is, is this really a medical question that he needs this treatment if there's no one but he himself who is saying, this is what I want? So I think the difficulty, Your Honor, is that looking at his allegations, it's hard to understand where that type of information would have come from in this scenario in the sense that he, after having suffered the health effects of being denied an adequate diet, went to the medical professionals multiple times and asked them and let them know that he was having this problem. And they said, that's not our bailiwick. You should talk to food service. But if you're trying to fit this in the Bivens context within the Carlson case, because essentially, as you know, with Bivens, you've got to have a pretty good fit in order to say that you have a Bivens action in light of a bossy, then how does this fit within Bivens? You would think the attorney or somebody representing him at that time would want to get that expert to say, or probably a psychiatric expert to say, here's what he truly needs and try to fit it into the asthma-type situation that this is dire that you saw, for example, in Carlson. And indeed, in Carlson, the inmate died. But it seems here that we're far from that without the expert telling you that you need to have a different type of treatment other than medication by the prison doctors. So a few points in response to that. On the scope of the Carlson context, I think some of this court's language in the recent Shorter case and the Bistrian case suggests that the Carlson context is actually much more expansive than the government would suggest and extends to the denial of any of life's essentials. You're looking at Bistrian's author and Shorter's author. I'm not sure we agree with that. So I think in footnotes... You can add me in that area of disagreement. All I'm suggesting is that there's language, I think, in footnote 5 of the Shorter opinion talking about how the reason the Supreme Court in Abbasi and Hernandez didn't specifically enumerate Farmer was likely because Farmer fell within Carlson's Bivens context. And so to the extent in this case the court is looking to narrow the scope of Carlson's Bivens context to exclude something that I think is much closer to Carlson itself than the Farmer, Bistrian, Shorter scenario, the court just has to reconcile that language in its decisions, and I think it's difficult to do so because... How so? If what we were concerned about, and we were concerned about it, was that nothing in Abbasi and nothing in earlier decisions of the Supreme Court overruled Farmer, so Farmer was still good law. And so you had an Eighth Amendment claim for a failure to protect, and that stayed on the books. You could... The Supreme Court may have considered that under the general context of needing to take care of and look out for prisoners, but it doesn't mean that somehow Carlson went beyond the boundaries of Carlson. In Carlson you had a severe medical need diagnosed. Nobody disagreed with it. Treatment was called for, and they didn't give the called-for treatment. Here you're dealing with an issue, it looks like, where there was a diagnosed medical need, some treatment was being given, and that's where the similarity to Carlson appears to end, because instead of being a circumstance where the prison officials go off and refuse to give the treatment that was required and actually medically noted for the asthmatic patient, they didn't give him any treatment, and then finally when they did, they gave him the wrong treatment and killed him. And the Supreme Court said, you can't do that. Here, from the record, and correct me if I'm wrong, it appears he's given treatment, he doesn't think it's enough, but nobody else says it isn't enough. It's his self-diagnosis at that point that he needs something more. Now, how is that like Carlson? We're no longer dealing with somebody who's got a medically prescribed need, or a need which has a medical prescription associated with it. We're dealing with a circumstance where a prisoner says, I don't agree with them that my treatment should just be medicine. I need this other thing. How is that like Carlson? So we're here on the motion to dismiss stage, and what he alleges is that he had the diagnosis and suggests that his medical records were substantiated, and that when he came to the prison officials and the medical officials, letting them know that the conditions he was suffering were amounting to the deprivation of life's essentials, they refused to do anything. So I think it might be the case later on in discovery, it becomes clear that there are medical records that might illuminate the situation. I hate to interrupt you, Mr. Milesby, but when you say he alleges they just did nothing, that's just not true. They did do something. They gave him medicine, and when he said, I'm still suffering, they gave him an increased dosage. And after that, he says, it's still not helping. I want something more. And they don't agree. That doesn't sound like they did nothing. It sounds like they disagreed with what his self-diagnosis and self-prescription was. But his allegation is not that they disagreed with his self-diagnosis. He says, and this is at 4 of the complaint, that Defendant Hornig issued a blanket denial of his complaint, told him he could take it all the way up and nothing will happen. He suggests it was indicative of bad faith. Later in the complaint, he says it's spite or malice. That's the food service people who said that to him, right? Right. And then the medical service people, when he went to them after it was not, he was still continuing to suffer the health effects of malnutrition, they said that psychology has nothing to do with food service, and that's 5 to 6 of the complaint. He says he was never consulted again by the medical professionals, despite requesting counseling on multiple occasions. So I think he has alleged that he was seeking precisely the type of medical diagnosis that you're describing, and there's no allegation that he provides, and he couldn't at this stage, that a medical expert had testified that he didn't need it. So I think the relevant question, at least on the qualified immunity and Eighth Amendment side, is whether or not at this stage, construing all inferences in his favor and interpreting his complaint liberally in light of his pro se status, whether or not he's stated a sufficiently severe harm. Looks like qualified immunity for a second because you're almost out of time. Answer, if you would, Mr. Overvold's argument that when you get to qualified immunity, if you get to qualified immunity, the district court just failed to address this at the level of concreteness, too high on the ladder of abstraction, so to speak, and that the Supreme Court's been very clear that you have to be fact specific, and the magistrate judge wasn't. She said, yeah, everybody knows that cruel and unusual punishment is bad, so everybody knows that, so no qualified immunity. What's wrong with that argument? So my response to that is I think this court's case law, in cases like Phillip and Jackson, and those are the allergy cases, make the right sufficiently clear at a sufficient level of generality that this court could affirm on that ground. I don't, you know, in both of those cases, this court made clear that you can't force a prisoner to a choice between not eating nutritionally adequate food or suffering health effects from a diagnosed medical condition. In those cases, it were allergies. Both of those cases arose on pro se motion to dismiss, just like this case, whereas nearly all of the cases the government relies on were summary judgment cases, looking at medical records, which provided precisely the type of evidence that Judge Roth was asking about in describing the specific nature of the medical condition. Here, all we have is the complaint. All we have is his allegations. Here, all we have is the district court saying plaintiff, defendants argue they are entitled to qualified immunity because plaintiff cannot identify clearly a status right, and then the court says the court's determined that the allegations of the second-man complaint plausibly show defendants violated constitutional rights. The law regarding deliberate indifference is sufficiently clear. Our officers should have been aware of their actions to prove and violate the Constitution. That's it. You got one sentence. How can that stand up? So the district court's opinion prior to that discusses, in describing the scope of the Eighth Amendment right, the requirement to provide food, and I think the cases the district court cites there are sufficiently clear that it gets you to qualified immunity, but even so, this court could affirm on any ground, and at most, I think that would get the government a vacate and remand for the district court to rewrite that portion of its opinion on qualified immunity and cite the cases we cite in our brief here, the Jackson case, the Phillips case, that describe the right at a sufficient level of generality. So I don't think there's any need to send it back to the district court to rewrite an opinion that this court could write itself. Thank you very much. Thank you, Your Honors. I'd like to just make three quick points, if I could. There has been some disagreement between the parties on appeal about what the allegations actually are. I do think the district court, at page 7 of the appendix, accurately captures the allegations. The court's not giving short shift to the plaintiff. I mean, she let the claim go forward, but she does accurately capture the allegations there. Why don't you directly meet Mr. Niles-Weed's assertion that if you take the allegations of the complaint on their face and with every reasonable inference in their favor, his assertion in the complaint is, I couldn't get a medical diagnosis. I needed this. I went back to them. They wouldn't see me. That is deliberate indifference. The allegations don't reflect the sort of failure to treat he's describing. The allegations are the plaintiff went twice to the dining hall, I believe immediately after his transfer to the facility. He suffered panic attacks. He was provided medication. He indicated in one of his responses it's not a medication issue. There's not an allegation even he tried to go back to the dining hall after he was provided the medication. Well, is there an allegation that they wouldn't see him in the psychiatric unit? I'm not aware of an allegation that they refused to see him. There might be an allegation, I believe, that he was requesting individual counseling and wasn't provided that, but that, again, does not sort of get you to the deliberate indifference, total denial of treatments that might give rise to a Carlson claim. And just the one other point on sort of the Abbasi analysis, even a modest extension of Carlson is an extension, and where what is being requested or argued is constitutionally required is not medication, but a change in the prison's procedures alleged to be required to allow for adequate nutrition. Here you can imagine a different case alleging that a change in housing assignment is required as treatment. So you're basically saying courts shouldn't interfere with Bureau of Prisons' internal affairs? We're noting that it raises different questions than the particular medical context of Carlson, where it's what's being requested is a change in how the prison provides, ensures that prisoners get adequate food in a safe and secure manner. That raises different questions, and there's also a different sort of set of alternate avenues for some redress than would be available in Carlson. Both those both indicate it's rising in a new context and serve as special factors counseling against the extension of the Bivens remedy in that context. All right, thank you very much. Thank you to both counsel. Mr. Malswede, it is wild. That's what I'm hearing about in this case. I think, as you have done before, I thank you very much for the work that you do. It is immensely appreciated by all of us. Thank you to both counsel for a very well-presented oral argument.